IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Northern Division*

| | | |
|---|---|---|
| HAWTHORNE INDUSTRIAL PRODUCTS INC. for its own account as consignee of certain cargo and as agent for GENESIS PRODUCTS INC., GREAT LAKES LAMINATION, GREAT LAKES FOREST PRODUCTS, and FUSION WOOD PRODUCTS, <br><br>Plaintiffs <br><br>v. <br><br>M/V TAC IMOLA, IMO No. 9932103 her engines, boilers, tackle, etc., *in rem*, RATU SHIPPING CO. SA, NISSHIN SHIPPING CO LTD, FLEET MANAGEMENT LTD-HKG, TRANSATLANTICA COMMODITIES PTE. LTD., and HANWIN SHIPPING LIMITED, *in personam*, <br><br>Defendants | § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL NO. 1:22-cv-01376-RDB |

## DECLARATION OF RUSSELL STADELMAN IN SUPPORT OF THE CARGO INTERESTS' MEMORANDUM IN OPPOSITION TO VESSEL DEFENDANTS' MOTION TO DISMISS

I, Russell Stadelman, declare and state:

1. I am a Director and Officer of Hawthorne Industrial Products Inc.

2. I am authorized on behalf of Hawthorne as well as the other Plaintiffs (the "Cargo Interests") to make this Declaration.

3. I am over the age of 18.

4. I am competent to make and swear to the statements made herein.

5. I have personal knowledge of the facts stated herein.

6. I incorporate by reference my prior declaration in this case dated August 5, 2022 [ECF No. 40-2].

7. The Cargo Interests collectively purchased about $34 million of plywood (the "Cargo"), which according to the bills of lading was to be delivered in Baltimore, Maryland.

8. In the ordinary course, the Cargo Interests were not to be responsible for unloading the Cargo in Baltimore, Maryland.

9. M/V TAC IMOLA (the "Vessel"), which was carrying the Cargo to Baltimore, Maryland, was expected to arrive on or about January 8, 2022.

10. However, the Vessel's voyage was reportedly disrupted by a series of fires onboard and deviations to a handful of foreign and United States ports other than Baltimore, Maryland.

11. Due to the fire, Rukert Terminals Corporation, the usual terminal used for our products in Baltimore, would not discharge the cargo until the damaged cargo was removed from the Vessel.

12. The Vessel sat at anchorage in Annapolis, Maryland for weeks until the Vessel eventually arrived on or about March 5, 2022 at the Federal Marine Terminal ("FMT") in Albany, New York, where its owner, managers, and/or charterers had arranged—without my input or consent—to discharge some or all of the Cargo.

13. But, FMT was ill-prepared to handle the severely distressed Cargo, and its lack of protected storage space exposed some of the discharged Cargo to hazardous weather, thereby rendering it useless. Moreover, some of the Cargo was haphazardly loaded back onboard the Vessel, making it impossible to accurately account for all of the crates.

14. Making matters worse, the Vessel's owner, managers, and charterers did not pay FMT, and so Hawthorne was not only compelled to pay FMT about $175,000 but has also received a supplemental claim from FMT in the amount of about $450,000.

15. After leaving Albany, New York, the Vessel remained at anchor off Long Island, New York for more than hot mid-summer one month—with moldy, firewater soaked Cargo—while its owner, managers, and/or charterers continued to breach their obligations to promptly deliver the Cargo to Baltimore, Maryland.

16. To break the stalemate and mitigate its damages, Hawthorne was compelled to pay about $575,000 to P&M Brick Terminal ("P&M") at Coeymans, New York, to unload some of the other damaged and destroyed Cargo that remained onboard the Vessel.

17. Frustratingly, P&M was also ill-prepared to handle the severely distressed Cargo and, as a consequence, not all of the Cargo could be discharged there.

18. Rukert Terminals Corporation still refused to discharge the cargo in Baltimore, and so I was required to find another terminal to handle the Vessel. I made two trips from my office in Florida to Baltimore to identify another terminal and, eventually, Canton Marine Terminal indicated a willingness to proceed with the discharge.

19. The Vessel finally arrived at Baltimore, Maryland on or about June 1, 2022, but it did not immediately discharge the Cargo; instead, it again waited at anchor, until the Cargo Interests intervened in this Court.

20. As a consequence of the Vessel's owner's, managers', and/or charterers' failure to meet their obligations to promptly deliver the Cargo at Baltimore, Maryland in good order and condition, the Cargo Interest have suffered and are continuing to suffer damages including, but not limited to, extra charges for handling, storing, and disposing of the distressed Cargo.

21.     Additionally, the Vessel's owner's, managers', and/or charterers' actions and inactions allowed the Cargo, long after its arrival in the United States, to continue to move, shift, collapse, warp, decay, decompose, and smell to the point where it can no longer be used.

Pursuant to 28 USC, §1746, I verify under penalty of perjury that the facts as stated above are true and correct to the best of my knowledge.

Executed on this $^{22nd}$ day of November, 2022.

_____
Russell Stadelman